ELIZABETH B. MARTIN *v.* WM. MARTIN, Jun'r.

On a bill by a wife against her husband for a separate maintenance, alleging an aban-
donment of her by her husband, an answer was put in, and testimony taken; and
a motion was then made, on the part of the complainant, for alimony *pendente lite.*
It appeared in the case, that the complainant was living with her father, away from
the defendant's house, having two of the children with her; and each party claimed
that the abandonment was by the other.   The Chancellor said, that if the com-
plainant would go, with the children she had with her, to the defendant's residence,
and he should refuse to receive her as his wife and provide for her and the children,
the Court would, on being properly informed of such refusal, allow alimony *pen-
dente lite ;* but denied the motion as the case then stood.

The bill, filed March 3, 1851, states the marriage between
the complainant, (whose maiden name was E. B. Cumming,)
and the defendant, on the 23d November, 1843.   That they
commenced housekeeping, at Beatty's Town, Warren County,
in May, 1844, and resided there until September, 1848, when
they moved to Hackettstown, in the same County.   That the
complainant has four children by her said husband, the oldest of
which was 6 years old in September, 1850 ; and the youngest of
whom is about 4 months old.   That she and her husband lived
together very well until about four years ago ; at which time she
whipped the eldest child, then about two years old, moderately,
for some misbehavior, in her husband's presence, on a Saturday.
That her husband made no objection to the correction then ; but
on Monday he went to his mother's, who lived in the vicinity,
and returned ; and again, Monday evening, went to his mother's
and returned in the night, after the complainant had retired to
bed, about 11 o'clock at night, and got into bed, and then asked
complainant why she whipped that child, and said she had
whipped the child unmercifully, and ordered the complainant
to get out of bed and go home ; and said that if she did not get
out of bed he would kick her out ; and said he would call up the
hired man, Hankinson, and send her home.   And he tried to
push the complainant out of the bed ; but, as she was tangled

up in the bed clothes, he did not succeed.    And he then left her bed, and went into another room and slept by himself.

That after they moved to Hackettstown, about August, 1849, the defendant became deranged, and for about the space of a week deprived of his reason: he then recovered his mind.    That during his derangement he had a great antipathy to the complainant, and accused her of infidelity to him; and has ever since occasionally charged her with infidelity to him; and still seems to harbour an enmity towards her.

That, about May, 1850, she was engaged in having her house cleaned, when the defendant wanted her to help carry out the parlor stove.    That she was then in a delicate situation, and was unable, from bodily infirmity, to do so, and so informed him, when he flew into a violent passion and pitched the stove over and rolled and tossed it over the carpet and out of the room, breaking off the door of the same and some of the feet; and he went off and got his dinner away from home, and did not return home until late in the afternoon.    That from that time on he absented himself from home a good deal, without giving any notice where he was going, or without any apparent business, and was very distant and unfriendly towards her; sometimes professing his friendship in a very unnatural and constrained manner; and during the summer and fall, on several occasions, requested complainant, after night, to go with him down to the bank of a small pond not far away, under pretence of seeing the water; but his conduct towards her was such as to excite her suspicions of his intentions being correct; and she declined at any time to go with him there.

That, about the last of November, or first of December, 1850, he went off one afternoon across the fields, without mentioning to her, or any other person as she thinks, where he was going, and was gone until late at night, and about 11 o'clock he returned and built up a large fire in the stove in the room adjoining that in which she slept; and she observed that the candle which was near the stove was melting from the heat, and asked him if he had not better move it back, when he answered that it was none of her business; and he sat up by the stove without

going to bed the most of the night, and the complainant dared not go to sleep while he was there.

That he continued to maltreat her, and frequently ordered her to go home, and conducted towards her in such a manner as to put her in fear of her life and personal safety. That on a Sunday afternoon, the last of December, when she was preparing to go to meeting, he requested her to go out of the kitchen, where the other members of the family were, into the parlor with him. That she went, not knowing what he wanted of her, and he closed the door after them as they went in, and then turned to her and took her hands in one of his and held on very tightly, while he put his other hand into or in the direction of his pocket, and seemed much excited. That she efforted to get away, and he said why should we be afraid; but she got loose from him, and got out of the parlor. That he made no communication, nor introduced any subject of conversation, nor seemed to have any call for the complainant in the parlor, nor gave any pretence of any.

That she was afraid of her said husband; and Samuel Gulick, his clerk, came to sleep at night with him, to which he assented, and had a bed prepared for them to sleep together in another room from complainant, and complainant took the servant girl to sleep in her room. That she had a bolt to her room on the inside, and had it fastened. That on the same Sunday night, about midnight, the defendant came to her room door and tried to get in, but found it fastened, and then requested her to let him in, under various pretences of wanting certain articles which were not in there, and which she informed him where he could find; and then upon the further pretext that he wanted to see the children; but that complainant was afraid to let him in unless Gulick would come with him: and he left and returned to his own room.

That on Thursday of the same week, the 2d January, 1851, he told her she should go home; and he spoke to Robert Stelle, Esq., to take her home. That Stelle was going that day to take dinner with complainant's brother-in-law, John C. Potter, on the road towards her father's; and, as her husband said he would go

along, she concluded to go and see if she could not get her husband reconciled to her; and they went to said Potter's, and all took dinner together; and, instead of going on to her father's, returned home; and that night he told her she should not lodge in the house, and compelled her to go out and get lodging, with her babe, at one of the neighbors. That she returned in the morning and prepared breakfast, and she and her husband breakfasted together; and after breakfast he told her she must go home that day. That they had killed hogs a few days before and she was about to engage, that day, in the necessary preparation for attending to the same, and so informed him that she wanted to attend to it that day, and tried to defer him; but he said she must go, and sent a line to said Stelle to come and take her. Defendant went out to his store, and came back and said to her that she must go, and that Stelle would take her. That Stelle came, and said he would take complainant if she must go, and defendant said he would go along; at which Stelle said he would not go if defendant went, that he could take her himself and complainant tried to persuade defendant to let her remain and attend to fixing the meat; but he said she must go that day, and that if she did not go and get out of his way he did not know what he might do to her; that he did not want to hurt her, but that if she did not go he did not know what he might be tempted to do, he did not know but that he might throw himself into chains before night. And he then got up his horse and sleigh, and his clerk, Gulick, went with him; and they took the complainant, with the second and the youngest child, up to the complainant's father's, the third child being there at that time. That they drove the complainant to her father's, and set her and the said children out upon the side of the road in front of her father's house; and neither of them went in, or stopped to hold any conversation upon the business of their coming over, or otherwise, and drove back. That the oldest child, which was left at defendant's, was taken sick the next week with the whooping cough, and needed complainant's attention, and she went and got it and took it also to her father's, where she and her four children have since been living upon his hospitality.

That her husband made no visit to her, or any communication to her, after he took her to her father's, until about the 7th of February thereafter, when he, with his said clerk, drove up, and stopped in the road opposite her father's, on their way, as she understood at the time from the said clerk, to Cummingstown, on some business ; and the said clerk came into the house, the defendant remaining in the wagon, which had but one horse before it. That said clerk inquired of complainant if she was ready to go home, and said that William, her husband, wanted her to come home. That she informed him the children were too unwell to go out then, and that she was not then ready; not expecting them ; but that she was coming down to see about some affairs that week, or very soon, and they could make arrangements. That the said clerk then said, take notice that William, meaning the defendant, did not calculate, then, to pay for any board of complainant and the children, and went out, and they drove off. That complainant's father asked said clerk why the defendant did not come in, and he said he had not time. That at this time the defendant had advertised an auction to sell off his store goods, and perhaps his household goods, and had advertised his house and store-house, in Hackettstown, for rent; and afterwards, on the 18th, 19th and 20th of February last, (1851,) held an auction of his personal property, and, as complainant has been informed, disposed of most of his personal property, including his only cow; and seems preparing to discontinue housekeeping.

That, after she was married and commenced housekeeping, she was provided by her father with an outset of personal property, amounting to $280 in value, which went into defendant's possession. That by the will of her grandfather, Job Johnson, a legacy was bequeathed to her, which her husband, about 1846 or 1847, received, amounting to $306. That by the same will there was devised to her the one-fourteenth of a certain farm, from which her husband received a rent of $41 a year for four years, and afterwards the said farm was sold by Commissioners, and the portion coming to her therefrom, amounting to $850, was paid to her said husband, about the spring of 1848.

The bill then states the pecuniary circumstances of the defendant.

That her father, being unable from bodily infirmity to go about to attend to business, sent for his brother-in-law, Azariah Davis, Esq., to come and attend to the matter on the part of the complainant; and that said Davis, at the request of the complainant and her father, went to Hackettstown, in company with complainant's brother, J. J. Cumming, to see the defendant, to see if he would make any provision for her, or any arrangement to let her come back and live at his house again, in a peaceable manner. And the complainant has been informed, and believes, that said Davis and her said brother went to see the defendant; that they found him at his house, in Hackettstown, in company with some of his brothers and friends. That, immediately on the defendant's seeing her said brother in the house, he ordered him out of the house, without any ceremony or conversation, and appeared very much enraged against him, without any previous difficulty between them; and that when the said Davis introduced the subject of the difficulty with the complainant, and expressed a desire to have some peaceable and amicable settlement, he said to Davis, that if that was his business he should leave the house, and refused to entertain any conversation on the subject. That she has been informed and believes, that said Davis endeavored to get some arrangement of the matter through the brothers and friends of the defendant; but could get no satisfaction, or any interference by them in the matter; and was given to understand, that if complainant attempted to force any settlement or provision for her, that her said husband must be or would be prepared to meet it. That, from the course pursued by her husband, she really believes, that, unless prevented by the injunction or order of this Court, he will convey or incumber his real estate so as to prevent her obtaining any provision therefrom or from him.

That her said husband has, without any justifiable cause, abandoned her and separated himself from her, and hath refused and neglected, and still refuses and neglects to maintain and provide for her or for her children.

The bill prays, that the defendant may be decreed to pay and provide such suitable support and maintenance for the complainant, and her said children, and for such time, as to the Court shall seem just.

An answer was put in, and testimony was taken. And a motion was now made, on the part of the complainant, for alimony *pendente lite,*

*P. D. Vroom* in support of the motion.

*S. G. Potts* contra.   He cited 1 *Halst. Ch. Rep.* 471; 2 *Barb. Ch. Rep.* 147 ; 3 *Ib.* 206 ; 11 *Paige,* 46.

THE CHANCELLOR.   The bill is for a separate support and maintenance for the wife and children.   The present motion is for alimony *pendente lite.*

I have had occasion before to say, that it is not a matter of course to allow alimony *pendente lite ;* that the circumstances of the case will be looked into, and a discretion exercised by the Court.

The opinion and action of the Court in the case cited from 1 *Halst. Ch. Rep.* 471 is correctly shown in the synopsis of it. The language given as the opinion of the Court is incorrect.

In this case, the bill contains a general allegation that the defendant has abandoned the complainant ; but the facts stated in the bill fall short of showing an abandonment ; and the answer and the facts stated therein and in the testimony deny it.   And no sufficient cause is shown by the bill or the testimony for an abandonment of her husband by the complainant.

I think the case, so far as regards this motion, may be put on very safe ground.   The question seems to be, on whose part is the abandonment.   If she is sincere in supposing that the defendant has abandoned her, we must suppose that she is willing to return to him.

If she will go, with the children she has with her, to the defendant's residence, and he shall refuse to receive her as his wife

36

and provide for her and the children, the Court will, on being properly informed of such refusal, allow alimony *pendente lite.* But, under the present aspect of the case, the motion is denied.

Motion denied.